# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KENNETH STARR,

       Plaintiff,

v.                                            CV 10-1131 JCH/WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Kenneth J. Starr filed applications for Disability Insurance Benefits and Supplemental Security Income payments on June 19, 2006. (Administrative Record ("AR") 28, 70, 78.) He alleged disability beginning May 31, 2004, due to low back pain, depression, and dyslexia. (AR 70, 759H.) Administrative Law Judge ("ALJ") George W. Reyes held a hearing on November 19, 2007. (AR 841-83.) On September 22, 2008, he determined that Starr was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 38.) Both applications were denied. (*Id.*) Starr filed an appeal with the Appeals Council, but it declined Starr's request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 3.)

Starr sought review of the SSA's decision on November 24, 2010 (Doc. 1), and filed a Motion to Remand or Reverse Administrative Agency's Decision on August 11, 2011 (Doc. 22)[1]. The Commissioner responded (Doc. 28), and Starr filed a reply (Doc. 31). After having read and

---

[1] Motions and supporting briefs are limited to twenty-seven double spaced pages. D.N.M.LR-Civ. 7.5. Starr's motion and brief were clearly not double spaced. Appropriately spaced, it would have been well over the page limit. The Local Rules are not optional. Also, counsel is discouraged from using excessive bold and underlined typeface.

carefully considered the entire record, I recommend that the Court GRANT Starr's motion and remand the case for further consideration consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, are also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity and the medical severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from

performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25. *See also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

### FACTUAL BACKGROUND

Starr is forty years old and he alleges that chronic back pain and mental impairments prevent him from working. (AR 96, 855.) From 1995 to 2004, Starr worked as an exterminator for various pest extermination companies. (AR 36, 94, 760-61.) In 2003 and 2004, Starr was in two motor vehicle accidents, which have since caused him low back pain. (AR 31, 104-05, 849-50.) After the 2003 accident, Starr saw his primary care physician, William Baker, D.O. (AR 409.) Dr. Baker ordered an MRI, which revealed he had a herniated disc at L4-L5 that produced a marked deformity of the left L5 nerve root, and he had a broad-based L5-S1 disc herniation producing lateral recess stenosis with minimal facet synovitis. (AR 412.) Dr. Baker referred Starr to Del Valle Physical Therapy for treatment. (AR 418-21, 428.) During this time, Starr also saw Brett Henderson, M.D., at the El Paso Orthopedic Surgery Group and Center for Sports Medicine. (AR 747-51.) Dr. Henderson did not think surgery was necessary. (AR 748, 751.) On January 5, 2004, Dr. Henderson released Starr to work on light duty status, and he opined that Starr should not carry a five gallon

jug on his back.[2] (AR 755.)

There is no record that Starr went to see Dr. Baker after his second car accident in May 2004. Rather, he saw J. Wayne Barker, a chiropractor. (AR 614.) At this time, Barker wrote Starr an excuse slip which stated "No work until further notice." (AR 622.) Barker also referred Starr to Terren Klein, M.D., at the El Paso Orthopedic Surgery Group and Center for Sports Medicine. (AR 629, 631-32.) Dr. Klein ordered x-rays and an MRI, which revealed disc herniation and lumbar sprain with mild degenerative disc disease. (AR 631-32, 638.) Dr. Klein then referred Starr to Dr. Villareal for epidural injections to manage the pain, but Starr later claimed they were ineffective. (AR 638, 643.) Dr. Klein sent Starr to Dr. Refaeian for an EMG nerve study; the nerve study came back negative, showing no evidence of extremity radiculopathy. (AR 638-39, 643.) In his notes from September 2004, Dr. Klein commented that Starr was very "pain focused" and that he had stopped working despite Dr. Klein's opinion that he could perform "light duty work with no bending, stooping, or squatting." (AR 643-44.)

In September 2004, Dr. Klein referred Starr to David Masel, M.D., for a surgical consult. (AR 643.) Dr. Masel initially proceeded with conservative treatment. (AR 646.) When the conservative treatment did not help, he performed a laminectomy on Starr's lumbar spine on May 16, 2005. (AR 493-94, 517-18, 643.) As part of his post-operative care, Dr. Masel sent Starr to physical therapy, where he worked with therapist Ryan Bybee. (AR 242.) Dr. Masel saw Starr in 2007 and diagnosed him with post-laminectomy syndrome, but he did not schedule any follow up appointments. (AR 123.) Starr returned in 2008 with his attorney, but Dr. Masel told him that he did not hold attorney conferences during office visits, and he noted that Starr's "symptomology has

---

[2]Starr testified that, as an exterminator, he wore a five gallon jug on his back as he worked. (AR 875.)

remained stable since his last visit." (AR 121.)

Starr was treated for depression concurrently with his pack pain. In December 2003, Dr. Henderson prescribed Starr anti-depressants after noticing Starr appeared depressed during an office visit. (AR 387.) Starr has continually remained on some type of anti-depressants since that date. (AR 33.) From 2007 to 2008, Starr went to Southwest Counseling Center, Inc., and saw Vickie Alvarez, C.N.S., and Albert Jacquez, L.M.S.W. (AR 126-49, 165.) In June of 2007, Jacquez diagnosed Starr with Attention Deficit Hyperactivity Disorder, a learning disorder, a major depressive disorder, and an anxiety disorder.[3] (AR 140-42.) At that time, Jacquez assessed Starr's Global Assessment of Functioning ("GAF")[4] at forty-five. (*Id.*) In July 2007, Alvarez diagnosed Starr with Bipolar II Disorder, and she performed a psychiatric evaluation of Starr.[5] (AR 170-77.) A few months later, in October 2007, Jacquez and Joseph Frenchen, M.D., completed a mental evaluation of Starr. (AR 166-68.) Jacquez performed an updated assessment in November 2008. (AR 787-91.) David Holcomb, Ph.D., also conducted a consultative mental evaluation in December 2008, which Starr submitted to the Appeals Council in May 2009. (AR 795-802.)

### HEARING TESTIMONY

The ALJ held an oral hearing on November 19, 2007, in Albuquerque, NM. (AR 343.)

---

[3]In New Mexico, a license social worker may diagnose and treat mental disorders. N.M. STAT. ANN § 61-31-6 (LexisNexis 2011).

[4]The GAF evaluates an individual's overall level of functioning. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (Text Revision 4th ed. 2000).

[5]The New Mexico Administrative Code does not explicitly grant a licensed Clinical Nursing Specialist ("C.N.S.") the right to diagnose patients, but there is an implied power to do so. In New Mexico, a C.N.S. may "make independent decisions in a specialized area of nursing practice" and may prescribe medications. N.M. CODE R. §16.12.2.15 (L) (LexisNexis 2011). In order to prescribe medications, C.N.S.'s must complete a course or have related clinical experience "such that students gain knowledge and skills needed to . . . make diagnoses of health status." *Id.*

During the hearing, Starr testified that he had difficulty moving around and that Dr. Baker had prescribed him a cane and a walker. (AR 844-45.) He explained that he had spinal surgery, and since the surgery he could move around but was still in pain. (AR 850-51.) He claimed that the pain radiated down to his feet and that, on a scale from one to ten, it was consistently an eight, even with medication. (AR 852.) The ALJ questioned him about physical therapy, and Starr stated that since the onset of his disability in May 2004, he has been able to walk one block at most. (AR 855.) However, he later admitted that during therapy he had walked up to two miles with a thirty minute break (AR 862), and he regularly performed thirty to forty-five minutes of cardiovascular exercise (AR 864). Starr stated that the physical therapy helped, and his physical abilities have "decreased" since he stopped therapy. (AR 865.) He quit physical therapy because he no longer had insurance. (*Id*.)

Vocational Expert ("VE") Pamela Ann Bowman testified regarding Starr's ability to work. She explained that Starr's job, as he performed it, was medium level work, skilled, specific vocational preparation ("SVP") of five, and that the five gallon jug he wore on his back probably weighed forty pounds. (AR 875.) She testified that the job of exterminator is classified as light work with a carrying requirement of twenty pounds, but, in her opinion, the job is "usually in the medium area." (AR 876-77.) The VE did not believe that a hypothetical individual who can occasionally lift twenty pounds and frequently lift ten pounds, sit for six out of eight hours, walk for six out of eight hours, occasionally go up ramps or stairs, cannot go up ladders or scaffolds, can occasionally engage in stooping, kneeling, crawling, and crouching, and can frequently engage in balancing, could perform the claimant's past relevant work. The VE stated that the hypothetical individual could engage in a light job, unskilled, with an SVP of two, and could be a parking lot attendant. She stated there were one hundred and fifty such jobs in New Mexico. (AR 878.) She also clarified that parking

6

attendant jobs would have a sit and stand option. The VE believed that a hypothetical individual with additional limitations in the ability to maintain attention and concentration could also perform a parking lot attendant job because there were frequent breaks. (AR 880-81.)

### THE ALJ AND APPEALS COUNCIL DECISIONS

The ALJ found that Starr has severe impairments due to low back pain and post-laminectomy syndrome, and that his depression and dyslexia are non-severe impairments. (AR 30.) Since Starr did not have an impairment or combination of impairments that met one of the listed impairments in the SSA regulations, the ALJ proceeded to evaluate Starr's RFC. (AR 34.) He found that Starr could perform the full range of light work. (*Id.*) The ALJ compared Starr's RFC to the demands of his past work as an exterminator, and held that he could return to his past relevant work as it is generally performed. (AR 38.) Since Starr could return to work, the ALJ concluded that he was not under a disability as defined by the Social Security Act. (*Id.*)

Starr appealed the decision of the ALJ, and submitted additional evidence to the Appeal's Council. (AR 12.) The additional evidence included a letter from Dr. Baker dated January 17, 2008, two mental assessments by Jacquez, and two affective disorder forms by Jacquez. (*Id.*) The Appeals Council declined to review the case on September 23, 2011. (AR 3.)

### DISCUSSION

Starr alleges that the ALJ's decision is erroneous and should be reversed and remanded. He raises four legal challenges to the ALJ's determination. First, the ALJ did not adhere to the treating physician rule when he considered Starr's credibility in assigning weight to the opinion of his treating physicians. Second, the ALJ did not properly develop the record with respect to his mental impairment of depression. Third, the RFC determination was not supported by substantial evidence, and fourth, the ALJ erred in evaluating Starr's pain and credibility. Starr's argument regarding the

treating physician rule ultimately rests on the validity of the ALJ's credibility determination, so I will begin there.

## I.        Credibility Analysis

Credibility determinations are the "province of the finder of fact," and so I must defer to the ALJ so long as there is substantial evidence to support his findings and it is not overwhelmed by contradictory evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations omitted); *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994); *Diaz v. Sec'y of Health & Human Servs*., 898 F.2d 774, 777 (10th Cir. 1989).  The ALJ must set forth the specific evidence on which he relies, but he need not provide "a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000).

Starr claims that the ALJ's credibility determination was conclusory and therefore legally insufficient. He focuses on the ALJ's prefatory statement, in which the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment . . . ." (Doc. 23 at 15 (citing AR 35).) He claims that this is insufficient because it does not contain the "specific and explicit credibility findings" that are required by the SSA's rulings. (*Id.* (citing SSR 96-7p, 1996 WL 374186 (July 2, 1996)).)

Starr's selective citation of the ALJ's opinion is disingenuous. Had Starr bothered to continue the quotation in his brief, it would read ". . . for the reasons explained below." (AR 35.) The ALJ then proceeded to describe, over the course of seven paragraphs, the reasons he believed Starr was not entirely credible by pointing to the inconsistencies between Starr's testimony at the hearing and the evidence in the record. (AR 35-36.) For example, at the hearing Starr said that since his onset date he could walk no more than one block, but reports from his physical therapist stated

that he walked two miles with a break, and he could walk for forty-five minutes to an hour on a treadmill. (AR 35.) Starr testified that when on medication his pain was an eight on a scale from one to ten, but, on a form for his physical therapist, he stated it was a three out of ten. (AR 36.) In a physical evaluation, he stated his pain was halfway between "none" and "all the time." (*Id.*)[6]

The ALJ thoroughly documented the inconsistencies between the record and Starr's testimony, thus providing substantial evidence for his determination that the Starr was not entirely credible. Accordingly, I find that the ALJ made a proper credibility determination.

## II.     Treating Physician Rule

Starr argues that the ALJ's analysis of his treating physicians' opinions is erroneous and warrants remand. The duty of the ALJ to consider all of the medical evidence is outlined in the SSA's published rules. 20 C.F.R. §§ 404.1513, 416.913. However, not all medical opinions are treated equally. Under the treating physician rule, the ALJ must show deference to the opinion of a treating physician. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (describing the ALJ's duties under the treating physician rule); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (same); *Washington*, 37 F.3d at 1441 (holding that treating physicians are entitled more weight as a matter of law).

There are two distinct steps that the ALJ must follow when analyzing the value of a treating physician's opinion. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must

---

[6] In formulating his credibility determination, the ALJ also stated that Starr had testified "disingenuously" by reporting that he had not returned to work after his onset date in 2004, even though he had received payments from his former employer, Terminex, in 2005 and 2006. (AR 36.) Starr later forwarded a letter from Terminex to the Appeals Council, which clarified that the payments were not earned income, but had been insurance payments. (AR 760-61.) Thus, Starr had accurately testified that he stopped working in 2004, and the ALJ's belief otherwise was incorrect. However, Starr's remaining inconsistent statements during the hearing still rise to the level of substantial evidence, rendering the ALJ's credibility determination valid.

decide whether to grant the opinion controlling weight. *Id.* Her opinion will be entitled to controlling weight if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with other substantial evidence.'" *Doyal*, 331 F.3d at 762 (quoting 20 C.F.R. § 416.927(d)(2)). If the ALJ decides not to afford the opinion controlling weight, then the ALJ must move to the second step and "make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330. Those reasons must be evident in the ALJ's notice of determination or decision. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citations omitted).

SSA regulations and rulings provide a list of factors the ALJ should consider when assigning weight, which include: the length of the treatment relationship; the nature and extent of the relationship; the objective medical evidence; consistency with other records; whether the doctor is a specialist; and other factors brought to the ALJ's attention. *See* 20 C.F.R. § 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

According to *McGoffin v. Barnhart*, it is impermissible for the ALJ to reject an opinion solely "due to his or her own credibility judgements, speculation or lay opinion." 122 F.3d 1248, 1252 (10th Cir. 2002) (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). Starr relies heavily on the holding in *McGoffin;* in fact, he uses the authority as if it articulates a bright line rule that the ALJ may never consider the credibility of the claimant when assigning weight to a treating physician's opinion. (Doc. 23 at 6.) However, the rule lacks such clarity. In *McGoffin*, the ALJ discounted a psychological assessment by the claimant's treating physician because he was not convinced that the assessment was actually made by the physician who signed it. 288 F.3d at 1252. There was no consideration of the claimant's credibility, the medical evidence, or any other factors.

10

In fact, there was no evidence to support the ALJ's belief that the treating physician did not perform the assessment. The court held that the ALJ had an obligation to contact the doctor to verify the source of the report rather than reject it outright. *Id.*

Other Tenth Circuit cases have taken up the rule in *McGoffin* in more depth. In *Langley v. Barnhart*, the court reversed an ALJ for an outright rejection of the medical opinion of a treating physician, but its discussion of the ALJ's use of credibility is more nuanced than in *McGoffin*. 373 F.3d at 1120-21. In *Langley*, the key error was that there was no evidence in the record to support the conclusion that the physician's medical report was a recitation of the patient's complaints. *Id.* at 1121. Additionally, the court found that ALJ erred in rejecting the opinion outright, and he should have considered "what lesser weight the opinion should be given" or discuss "the relevant factors set forth in *§ 404.1527.*" *Id.* Thus, *Langley* indicated that the ALJ may consider the credibility of the claimant when assessing the weight of a treating physician's opinion, but only if the record contains evidence that the physician relied upon the claimant's subjective complaints in formulating her opinion.

*Victory v. Barnhart* applied the *Langley* rule. 121 F. App'x 819 (10th Cir. 2005) (unpublished). A treating physician completed a Physician's Statement of Physical Abilities, which included a checklist of the total amount of time a claimant could sit, stand, and walk, the maximum amount he could carry, and any postural limitations. *Id.* at 823. The ALJ thought that the opinion was "brief and conclusory and provided very little explanation of the evidence he relied upon in forming this opinion . . . [t]he ALJ concluded that [the doctor] . . . must have relied quite heavily upon claimant's subjective complaints." *Id.* at 823. The Tenth Circuit reversed the ALJ, noting that the ALJ's findings had no evidentiary support and "ignored all of Dr. Covington's examinations, medical tests, and reports." *Id. Victory* reiterated the principal that the ALJ should have determined

11

what lesser weight the opinion should be given using all of the "relevant factors set forth in 404.1527 and 419.927." *Id.* at 824.

*Boucher v. Astrue* distinguishes *McGoffin, Langley,* and *Victory* because it upheld the ALJ's decision to assign little weight to the opinion of a treating physician on the basis of the claimant's credibility. 371 F. App'x 917 (10th Cir. 2010) (unpublished). The ALJ gave controlling weight to a treating physician's recommendation that the claimant only do sedentary work, but did not give controlling weight to the recommendation that she work part time because the ALJ found it was based on the claimant's self-report. 317 F. App'x at 923. The Tenth Circuit upheld the ALJ's conclusion after reviewing the doctor's notes. *Id.* For example, one note stated that the claimant "feels she cannot work a 12 hour shift," and another that she didn't feel she could do "her regular work." *Id.* The court found that the presence of the doctor notes which recounted the claimant's concerns was evidence in support of the ALJ's conclusion. Since

> [T]he ALJ conducted a proper credibility analysis and reached a permissible conclusion that the claimant was less than fully credible . . . [i]t was not error for the ALJ to then use this conclusion as one factor among several in reaching a secondary finding that . . . [the] opinion should be given less than controlling weight.

317 F. App'x at 923-24. While *Boucher* is not controlling, it does provide useful insight into how and when credibility may be used under the treating physician rule. It clarifies *McGoffin* and *Langley* such that they may be distilled into a general rule: the ALJ may limit the weight of a treating physician's opinion due to the credibility of the claimant when there is evidence that the physician is merely reiterating the statements made by the claimant, the ALJ has made a valid credibility determination, and the ALJ considered credibility in conjunction with other factors.

With these concepts in mind, I now proceed to analyze Starr's allegation that the ALJ committed legal error in considering Starr's credibility when evaluating the weight to give his

12

treating physicians, specifically Ryan Bybee, Dr. Baker, and Dr. Masel. (Doc. 23 at 8.) After making a step three finding, the ALJ made an RFC determination. He discussed, at length, various physical and mental evaluations, the results of functional tests, MRIs, statements on medical questionnaires, and the hearing testimony. (AR 34-36.) After this discussion, the ALJ determined that he would give the opinion evidence of the treating medical providers "no more than limited weight." (AR at 36.) He explained, "The claimant's hearing testimony was completely unreliable, and it seems reasonable to assume that his statements to his medical providers were as well. It is unavoidable that many of the opinions are merely restating the claimant's subjective complaints and are not supported by objective findings." (AR 36-37.) The ALJ then proceeded to evaluate the specific opinions of the treating physicians and explain the degree of weight based on the available evidence. (AR 37-38.) While the ALJ clearly considers the credibility of Starr in weighing the treating physician's opinions, like in *Boucher*, he considers it in conjunction with the objective medical evidence.[7] Thus, unlike in *McGoffin*, *Langley*, and *Victory*, the ALJ did not base his opinion on credibility alone.

Like the *Boucher* Court, I will now consider the record to see if there is evidence to support the ALJ's assertion that physicians relied, to some extent, on Starr's subjective complaints. Additionally, to the extent that there is no evidence that an opinion is based on complaints, I will look to see if it conflicts with the objective findings. Since I have already determined that the ALJ's credibility analysis was proper, I will not re-consider this here.

---

[7]Starr argues that the Commissioner's claim that the opinion evidence is inconsistent with the record amounts to "post-hoc" reasoning, which is impermissible. (Doc. 31 at 3.) While it is true that I may not consider post-hoc rationale by the Commissioner, there is no post-hoc reasoning here. As previously noted, the ALJ stated that the opinions were "not supported by the objective findings."(AR 37.) Prior to making this statement, the ALJ had reviewed the objective findings and medical evidence. Therefore, his conclusion that the opinion evidence is not supported by those findings is analogous to stating they are inconsistent with those findings.

### 1.   Ryan Bybee

Ryan Bybee was Starr's physical therapist after he had surgery. (AR 242.) Starr argues that the ALJ erred in limiting the weight given to Bybee's opinion, specifically in his functional evaluations. (Doc. 23 at 6, 8; Doc. 31 at 4.) However, there can be no error under the treating physician rule because Bybee cannot be considered a treating physician. Only "acceptable medical sources" can be considered treating physicians. *See* SSR 06-03p, 2006 WL 2329939, at *2 (August 9, 2006). Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech language therapists. 20 C.F.R. §§ 404.1513(a), 416.913(a). The ALJ may, but is not required to, consider evidence from other sources such as physical therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).

### 2.   Dr. William Baker

The ALJ gave

> [L]ittle weight to the opinion of [Starr's] primary care physician, William T. Baker, D.O., as set out in an excuse slip dated May 12, 2004, a letter dated January 17, 2008, a Medical Assessment of Ability to Do Work Related Activities (Physical) Form completed on January 16, 2008, and a Medical Assessment of Ability to Do Work Related Activities (Non-Physical) form completed on the same date.

(AR 37. *See also* AR 13, 18-19, 152-53, 622.) The ALJ explained that these four opinions would receive little weight because the reports "merely [restate] the claimant's subjective complaints and are not supported by the objective findings." (AR 37.)

First, the excuse note dated May 12, 2004, is from J. Wayne Barker, D.C., not William T. Baker. Surprisingly, Starr and the Commissioner also failed to notice this distinction. I will not discuss this note since the treatment of Barker's opinion has not been appealed.

I turn now to the remaining opinion evidence. While the opinion evidence from Dr. Baker amounts to a whole three pages, the record contains notes from visits in late 2003, mid 2005, and

14

2006, which are instructive. (*See* AR 195, 200-05, 221-26.)

I begin with the paragraph-long letter, which states, "Mr. Starr is totally disabled." (AR 18.) This is a legal conclusion, not a medical opinion, and so the ALJ does not need to give it any weight. *See* 20 C.F.R. §§ 404.1527, 416.927 (stating opinion that claimant is disabled is not a medical opinion but an opinion reserved to the Commissioner). Dr. Baker continues, stating that Starr is in "chronic pain, 6 to 8 out of a 10 on a pain rating scale," and that "[h]e needs help to do simple daily tasks showering [sic], dressing etc [sic]." (AR 18.) These statements would naturally be based on subjective complaints. The pain scale is based on a patient's self-report, and since Dr. Baker had last seen Starr a year before writing this letter, he would need to rely of Starr's statements to know the impact of pain on his daily activities.[8]

Dr. Baker also writes that Starr has "severe weakness of his trunk musculature, balance problems and chronic depression." Muscle weakness and poor balance are both objective medical findings.[9] However, like in *Boucher,* the ALJ was relying on credibility in addition to other factors; here, the ALJ had stated that he was also relying on the objective findings. (AR 37. *See also* 20 C.F.R. § 404.1527(d)(3)&(4) (listing "supportability" and "consistency" as factors the ALJ may consider).) Prior to the discussion of Dr. Baker, the ALJ had made findings regarding Starr's functional abilities. Specifically, he mentioned that in physical therapy, Starr could perform up to an hour of cardiovascular exercise a day, walk up to two miles with a thirty minute rest, lift up to thirty pounds, and he had increased his range of motion in his lumbar region, especially in flexion.

---

[8]Prior to the evaluation in January 2008, the record indicates that Dr. Baker had seen Starr on December 12, 2006. (AR 221.) There are no medical records from Dr. Baker after 2006, with the exception of the letter and two evaluations.

[9]The ALJ accepted that Starr suffered from depression based on the medical record. (AR 33.)

(AR 35-36.) Thus, the ALJ was justified in assigning little weight to this letter because, to the extent it was not based on the patient's credibility, it conflicted with the objective medical evidence.

The ALJ also gave little weight to the two medical assessment forms from January 16, 2008. (AR 18-19.) These forms predate the letter by two days, so it is fair to assume that the same evidence which supported the letter also supported the forms. The physical evaluation form lists seven categories of limitations, all of which have "check-the-box" style reporting sections. (AR 18.) Six of the categories include a section for the evaluator to state the medical findings supporting the opinion. (*Id.*) Dr. Baker does not state the medical findings which support his opinion regarding two of the categories. (*Id.*) In failing to state the objective medical evidence for those categories, it seems logical that they must have been based on the claimant's complaints. Of the remaining four,[10] Dr. Baker cites some combination of Starr's limited balance, pain levels, and/or weakness. (*Id.*) There is also reference to a "repeated lifting test" under the "Lifting" category. (*Id.*) As previously mentioned, the opinion regarding pain is based on the subjective one to ten scale. Also, while weakness, balance, and lifting are objective findings, they conflict with the medical record. Furthermore, unlike in *Victory*, Dr. Baker's other medical notes do not contain evidence of examinations and tests which support these conclusions. Rather, almost all of his medical notes contain a list of patient complaints, current medications, and prescribed medications.(*See* AR 195, 200-05, 221-26.)

The last of Dr. Baker's opinions was the non-physical evaluation. (AR 19.) The form raised the claimant's pain as an impairment, and there is a hand-written notation that it is a "6-8/10 pain level." (*Id.*) Dr. Baker, using a "check-the-box" style form, then opined that Starr had "marked"

---

[10]The description of medical findings under the "Manipulative Category" is very difficult to decipher. (AR 18.)

limitations in the ability to concentrate, perform activities within a schedule, maintain physical effort for a period of time, sustain an ordinary routine without supervision, work with others without being distracted, and complete a normal workday and work week without interruption from pain or fatigue. (*Id.*) Below the checkmarks he wrote "Pain level and mental limitations extremely limit his ability to perform ADL's[11], testing." From this comment, then, the ALJ knew that the assessment was not based on testing, so it must have been the product of Starr's reports. As previously noted, Dr. Baker's other records do not contain evidence of prior testing.

The ALJ gave limited weight to Dr. Baker's medical reports, and I find that, like in *Boucher*, there is sufficient evidence to support the ALJ's belief that the reports were just reiterating statements by the claimant. Starr attempts to diffuse Dr. Baker's reliance on his self-reports, by stating that "Dr. Baker never questioned the reliability of Mr. Starr." (Doc. 31 at 3.) This is legally irrelevant. Credibility determinations are the province of the ALJ, not the physician. *See Kepler*, 68 F.3d at 391. To the extent that Dr. Baker's opinion is plausibly based on other medical evidence, it is inconsistent with the ALJ's specific findings regarding the objective medical evidence. Since there is evidence to show that Dr. Baker relied on Starr's subjective statements, and since it was considered in conjunction with a discussion of the objective evidence, the ALJ did not err in giving Dr. Baker's opinion little weight.

### 3.    Dr. David Masel

Dr. Masel is the orthopedic surgeon who performed Starr's spinal surgery and provided pre- and post-operative care. (AR 493-94, 517). Although the ALJ stated that he gave no more than "limited weight" to any of Starr's treating physicians, upon review of Dr. Masel's medical

---

[11]Activities of daily living.

notes, I can find no inconsistencies between Dr. Masel's opinion and the ALJ's findings. There can

be no error under the treating physician rule since the ALJ and Dr. Masel are in agreement.[12] Since

they are in agreement, I will not have to consider whether the ALJ properly relied on credibility in

weighing Dr. Masel's opinion. However, I will discuss Dr. Masel's opinion and explain why I see

no conflict with the ALJ's findings.

Dr. Masel did not provide a formal evaluation or assessment of Starr's medical condition.

Thus, in determining Dr. Masel's opinion, I am left to review his medical notes. Since Dr. Masel

performed surgery on Starr, I will refer to his post-surgical notes as being the best representation of

his final opinion of Starr's capabilities.[13] About six weeks after the surgery, Dr. Masel found Starr

was in "significantly less pain" and had 5/5 strength in his lower extremities, his sensation was

intact, and his gait was normal. (AR 671.) Three months after surgery, Dr. Masel wrote that Starr

was doing better, has 5-/5 strength, and he referred him to physical therapy. (AR 672.) The reports

from the physical therapist to Dr. Masel documented physical improvement. (AR 256 ("30%

improvement"), 270, 278 ("He is becoming more confident and completing [exercises] with less

pain with each session"), 296 (" he is tolerating [exercises] better each session").) In a report to Dr.

Masel dated May 4, 2006, the physical therapist concluded that Starr could perform light work and

lift up to thirty pounds. (AR 366.) The reports are not the opinion of Dr. Masel, but it is noteworthy

that he did not comment on or disagree with them.

---

[12]There is a technical, but harmless, error in that the ALJ did not state he was actually giving controlling weight to Dr. Masel. Harmless error is not grounds for reversal. *See* 20 C.F.R. § 498.224. Starr's ultimate argument is that the ALJ should have adopted Dr. Masel's findings, and, in practice, the ALJ did. Thus, there is no real reviewable issue here.

[13]Starr notes that in 2004 Dr. Masel opined he should not return to work. (Doc. 23 at 6 (citing AR 646).) However, this was prior to his back surgery, when Dr. Masel was still attempting conservative treatments. It likely does not reflect his final opinion of Starr's capabilities.

Of particular relevance are the medical notes of Dr. Masel in 2007. Dr. Masel ordered an MRI in January 2007, which he reviewed with Starr on January 4, 2007. (AR 123.) The MRI showed "[n]ormal alignment of the lumbar spine with no evidence of spinal canal stenosis or neural foraminal narrowing. No enhancing abnormalities." (*Id.*) During the physical examination, he found that Starr was oriented in all three spheres, had a steady gate with the assistance of a walker, and had good muscle strength. (*Id.*) Starr argues that the ALJ should have given greater weight to the observation that he was using a wheeled walker. (Doc. 23 at 6; Doc. 31 at 3.) However, Dr. Masel did not say in his notes that he required a walker, nor that he had prescribed it; rather, he only noted that Starr was using one. This notation does not constitute a medical opinion that Starr needs assistance walking.

Starr also focuses on Dr. Masel's statement that "he can have tingling in his legs." (AR 121; Doc. 31 at 3.) However, there is no further information regarding the extent, severity, or limitations caused by tingling other than it "may be slightly improved." (AR 121.) Without more information, it is unclear how this observation conflicts with an RFC determination that Starr may perform light work.

In April 2008, Dr. Masel noted that his symptoms had remained stable since 2007, and he stated that Starr should follow up "as needed." (AR 121.) The ALJ logically interpreted this as indicating that the treatment was complete, stating, "Dr. Masel gave no indication that further treatment was necessary or that the claimant had any specific functional restrictions." (AR 37.)

Ultimately, Dr. Masel did not state any restrictions on work in his last two years of treatment, his testing revealed Starr's spine was "normal," Starr had good flexion and strength, and treatment was no longer necessary. I do not see how any of that is in conflict with the ALJ's ultimate RFC determination that Starr could perform "light" work. Thus, I find that the ALJ did not err in his

19

consideration of Dr. Masel's opinion, since he ultimately agreed with it.

### III.   Development of the Record Regarding Starr's Depression

Starr argues that the ALJ's refusal to order a consultative psychiatric evaluation rendered the record underdeveloped as to his mental condition, and I agree. (Doc. 23 at 9.) As a basic rule, "the burden to prove disability in a social security case is on the claimant." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). *See also* 20 C.F.R. §§ 404.1512(a), 416.912(a) ("You must bring to our attention everything that shows that you are . . . disabled."). Nonetheless, the ALJ has the duty to develop the record with regard to every issue that is raised during the course of the hearing. *See Hawkins,* 113 F.3d at 1164; *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996).

The ALJ may purchase a consultative examination if he needs additional information after considering the full record and all available medical records. *See* 20 C.F.R. § 404.1519a(a). Consultative examinations are used to resolve a conflict or ambiguity in the medical evidence, if one exists, or to provide information when there is an absence of evidence such as clinical findings or a diagnosis sufficient to make a decision. *Id.*; *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir.1993) (holding that the ALJ should have ordered a consultative exam when there was not enough evidence to make an RFC determination).

It is clear from the record, the hearing testimony, and the ALJ's determination that Starr suffers from depression. In fact, the ALJ concluded that the record supports the diagnosis of depression. (AR 33.) The core question in a disability determination, though, is the degree to which the depression impacts Starr's ability to work. At step three of the sequential evaluation process, the ALJ concluded that Starr's mental impairment were non-severe because they did not limit activities of daily living, did not limit his social functioning, and only mildly limited his ability to concentrate. (*Id.*) The ALJ did not include any mental limitations in his final RFC determination. (AR 34.) It is

unclear how he came to these conclusions given that he rejected the available mental impairment evidence. It is here that I find that the ALJ committed legal error. The ALJ failed to properly develop the record so that he would have medical evidence on which to base his determinations regarding the impact of Starr's depression.

First, the ALJ considered the opinion of Vickie Alvarez, the C.N.S. who treated Starr at Southwest Counseling Services, Inc., in 2007. (AR 170-78.) Alvarez found that Starr's memory was impaired and that he had impaired concentration. (*Id*.) She assigned him a GAF score of 45, which indicates serious impairments in social or occupational functioning, and she diagnosed him with Bipolar Disorder. (AR 178; *See also* AM. PSYCHIATRIC ASS'N, *supra* note 4, at 34.) The ALJ did not reject her opinion outright, but he did reject her diagnosis because it "was not made by a physician, psychiatrist, or psychologist." (AR 33.) Since the ALJ's findings conflict with Ms. Alvarez's evaluation, it seems as if he rejected her assessment in addition to her diagnosis.

The ALJ also considered a mental evaluation by Albert Jacquez and Joseph Frechen, M.D. (AR 37, 165-68.) The evaluation found that Starr has moderate impairments in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; maintain attention and concentration; perform activities in a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary work routine without supervision; and complete a normal workday and workweek. (AR 166.) Starr had a marked limitation in the ability to work in coordination with others without being distracted by them. (*Id*.) With respect to social interaction, they found that he had slight impairments in the ability to ask questions or request help, get along with co-workers without distracting them, and maintain socially appropriate behavior. (AR 167.) He had a moderate impairment in the ability to interact appropriately with the general public, and he had a marked impairment in the ability to accept

21

instruction and respond appropriately with criticism. (*Id.*) Overall, the evaluators found marked restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AR 168.)

The ALJ rejected this opinion, too, on the grounds that Jacquez was a social worker and not an "acceptable medical source," and that "it is not clear that Dr. Frellen actually saw the claimant." (AR 37.) This statement alone amounts to factual and legal error. First, Dr. *Frechen* signed the evaluation. Second, as previously discussed under the treating physician rule, an ALJ cannot reject an evaluation because he is not certain that the doctor who signed the evaluation actually saw the claimant. *McGoffin,* 288 F.3d at 1252. *McGoffin* states that if there is doubt as to whether a physician saw and evaluated the claimant, the ALJ must contact the physician to ask for clarification, which the ALJ did not do. (*Id.*)

Additionally, even if it had been permissible to reject this evaluation, the ALJ was left with no medical opinions on which to base his ultimate findings regarding Starr's mental impairment and its impact on his RFC. If the ALJ has acknowledged that the claimant has a mental impairment, but he rejects the validity of the available evidence regarding the extent of the impairment, then he must order a consultative examination to help him appropriately determine the degree to which that impairment impacts the claimant's RFC. Otherwise, the ALJ is making a decision based on an absence of evidence, which is impermissible under *Thompson.* 987 F.2d at 1491. The dearth of acceptable records naturally overlaps with the requirement that the ALJ base his decisions on substantial evidence. *Hamlin,* 365 F.3d at 1214 (citation omitted). While this was raised as a separate ground for relief (Doc. 23 at 12), I note now that there is an inevitable corollary between the duty to develop the record and the duty to support findings with substantial evidence. In this situation, the ALJ has rejected the available evidence, which means his decision is based on nothing

in the record, not even a "scintilla" of evidence. This is an error which warrants remand. Since I have determined that the failure to order a consultative evaluation constitutes legal error, I will not consider Starr's remaining allegations.

CONCLUSION

The ALJ failed to properly develop the record with respect to Starr's mental impairment of depression. The ALJ gave no weight to the available psychological evaluations, so he was left with no evidence on which to base his mental RFC determination. His failure to order a consultative evaluation to remedy the absence of information amounts to legal error. Thus, I recommend that the Court REVERSE and REMAND the case for proceedings consistent with this opinion.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

_William P. Lynch_

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.